UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                  :

CLARUS CORPORATION,
                                  :

                   Plaintiff,       :

                                  :         22 Civ. 8132 (JPC)

         -v-                      :

                                  :         <u>OPINION AND</u>

HAP TRADING, LLC, and HARSH A. PADIA,    :             <u>ORDER</u>

                                  :

                  Defendants.     :

                                  :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Congress enacted Section 16(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78p(b), to prevent statutory insiders of publicly traded companies from unfairly using confidential information to turn short-swing profits. Section 16(b) achieves this objective by allowing the company or its shareholders to claw back profits realized by such statutory insiders who purchase and sell the company's stock within a given six-month period. Plaintiff Clarus Corporation ("Clarus") brings this action under Section 16(b) seeking to recover short-swing profits that Defendants HAP Trading, LLC, and its CEO, Harsh A. Padia, (collectively, "HAP") obtained through trading of Clarus stock between July 19, 2022, and September 16, 2022.

      HAP moves for summary judgment, arguing, *inter alia*, that those transactions fall under Section 16(d)'s exception for purchases and sales of securities incident to a dealer's involvement in over-the-counter ("OTC") market making. The Court agrees: HAP's purchases and sales of Clarus securities during the period in question are exempt from Section 16(b) liability because

they were incident to HAP's establishment and maintenance of an OTC market in packaged trades for Clarus securities. The Court therefore grants HAP's motion for summary judgment.[1]

## I. Background

### A. Statutory Background

#### 1. Section 16(b)

"Section 16(b) of the Exchange Act 'requires certain corporate insiders to disgorge all profits realized from any purchase and sale (or sale and purchase) of the same security made within a six-month period,' transactions often referred to as 'short-swing' trades." *Donoghue v. Y-mAbs Therapeutics, Inc.*, No. 21 Civ. 7182 (KPF), 2024 WL 3675716, at *7 (S.D.N.Y. Aug. 5, 2024) (alterations adopted) (quoting *Analytical Survs., Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 43 (2d Cir. 2012)). Section 16(b) provides:

> For the purpose of preventing the unfair use of information which may have been obtained by [a] beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . .

15 U.S.C. § 78p(b). "Congress enacted Section 16(b) as a prophylactic measure to 'deter insiders from taking unfair advantage of confidential company information to realize short-swing profits

---

[1] Given this conclusion, the Court does not reach HAP's alternative argument for judgment based on Section 16(e)'s exception for domestic arbitrage transactions, 15 U.S.C. § 78p(e). *See* Dkt. 96 ("Motion") at 22-34. HAP also moves to strike the supplemental expert report of Clarus's proffered expert, Charles R. Lundelius, Jr., pursuant to Federal Rules of Civil Procedure 26 and 37, Dkt. 91, and to exclude Mr. Lundelius's testimony under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), Dkt. 88. Because the resolution of these motions would not impact the Court's conclusion as to the applicability of Section 16(d), both are denied as moot, as is HAP's request for oral argument on them, Dkt. 94. To the extent that Mr. Lundelius seeks to state a legal conclusion, such an opinion would go beyond the scope of admissible expert testimony and therefore is not considered herein. *See, e.g.*, *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (holding that the Second Circuit "is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion").

on trades in the company's stock.'" *Roth v. LAL Family Corp.*, --- F. Supp. 3d ----, No. 23 Civ. 9265 (JPC), 2024 WL 4149241, at *3 (S.D.N.Y. Sept. 10, 2024) (quoting *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 122 (2d Cir. 2001)); *see also Gwozdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998) ("Section 16(b) of the Exchange Act seeks to deter 'insiders,' who are presumed to possess material information about the issuer, from using such information as a basis for purchasing or selling the issuer's equity securities at an advantage over persons with whom they trade." (citing 15 U.S.C. § 78p) (footnote omitted)).

Section 16(b) is a strict-liability statute and requires "[n]o showing of actual misuse of inside information or of unlawful intent . . . to compel disgorgement." *Magma Power Co. v. Dow Chem. Co.*, 136 F.3d 316, 320 (2d Cir. 1998); *see also Gollust v. Mendell*, 501 U.S. 115, 122 (1991) ("The statute imposes a form of strict liability on [insiders], rendering them liable to suits requiring them to disgorge their profits even if they did not trade on inside information or intend to profit on the basis of such information."). Rather, "the flat rule of Section 16(b) imposes a form of strict liability by effectively prohibiting an entire class of transactions in which the possibility of abuse of inside information was believed to be intolerably great." *Packer v. Raging Cap. Mgmt. LLC*, 105 F.4th 46, 53 (2d Cir. 2024) (internal quotation marks omitted and alterations adopted).

"The Exchange Act defines 'purchase' and 'sale' broadly, and [the Second Circuit has] said that § 16(b) applies to acquisitions and dispositions of equity securities in transactions such as conversions, options, stock warrants, and reclassifications." *Analytical Survs.*, 684 F.3d at 44 (internal quotation marks and citations omitted). "Given Section 16(b)'s strict-liability nature, th[e Second] Circuit has described the statute as 'strong medicine for the ill Congress sought to address.'" *Roth*, 2024 WL 4149241 at *6 (quoting *Olagues v. Perceptive Advisors LLC*, 902 F.3d 121, 125 (2d Cir. 2018)). Accordingly, the Supreme Court has made clear that "[i]t is inappropriate

3

to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language." *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 252 (1976).

Courts therefore "must assume" that "[i]f Congress wishes to impose such liability, . . . it will do so expressly or by unmistakable inference." *Id.* Thus, Section 16(b) must be applied "narrowly," *Packer v. Raging Cap. Mgmt., LLC*, 981 F.3d 148, 154 (2d Cir. 2020) (quoting *Foremost-McKesson*, 423 U.S. at 251), and carefully confined to its "limited areas of clear and unambiguous liability," *Lewis v. Varnes*, 505 F.2d 785, 788 (2d Cir. 1974). *See Donoghue v. Patterson Cos., Inc.*, 990 F. Supp. 2d 421, 424 (S.D.N.Y. 2013) (explaining that transactions "that do not fall squarely into [the statute's] framework are to be construed narrowly to favor the insider because of the strict-liability nature of Section 16(b)").

### 2. Section 16(d)

The Exchange Act affords some exceptions to Section 16(b)'s strict-liability regime. Relevant here is the statute's exception for over-the-counter market making, which is located at Section 16(d). This exception reads:

> **(d) Securities held in investment account, transactions in ordinary course of business, and establishment of primary or secondary market**
>
> The provisions of subsection (b) of this section shall not apply to any purchase and sale, or sale and purchase, and the provisions of subsection (c) of this section shall not apply to any sale, of an equity security not then or theretofore held by him in an investment account, by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market (otherwise than on a national securities exchange or an exchange exempted from registration under section 78e of this title) for such security. The [Securities and Exchange Commission ("SEC")] may, by such rules and regulations as it deems necessary or appropriate in the public interest, define and prescribe terms and conditions with respect to securities held in an investment account and transactions made in the ordinary course of business and incident to the establishment or maintenance of a primary or secondary market.

15 U.S.C. § 78p(d).

Section 16(d) was added to the Exchange Act as part of the Securities Acts Amendments of 1964 (the "Amendments Act"), Pub. L. No. 88-467, 78 Stat. 565, 579 (1964).  In the years prior to the Amendments Act, Section 16(b) was "conspicuously ineffective in coping with the 'insider-partner' who sits as a representative of his firm on a corporate board of directors."  William H. Painter, *Section 16(d) of the Securities Exchange Act: Legislative Compromise or Loophole?*, 113 U. Pa. L. Rev. 358, 360 (1965).  During the SEC's disciplinary proceeding in *Cady, Roberts & Co.*, 40 S.E.C. 907 (1961), which concerned Section 10(b) of the Exchange Act, "the Commission decided that a corporate insider must abstain from trading in the shares of his corporation unless he has first disclosed all material inside information known to him."  *Chiarella v. United States*, 445 U.S. 222, 227 (1980).  But if the corporate insider was a member of a partnership, it was thought that his partners could trade on the basis of inside information communicated to them by the insider without the fear of Section 16(b) liability, so long as the partnership was neither the beneficial owner of more than ten percent of the corporation's class of equity securities nor considered a "director."  Painter, *supra*, at 361-62.  This narrow view of Section 16(b) liability for partners of a corporate insider was confirmed following the cases of *Rattner v. Lehman*, 193 F.2d 564 (2d Cir. 1952), and *Blau v. Lehman*, 368 U.S. 403 (1962).  These holdings were thought to "presumably extend to incorporated brokerage houses, banks, insurance companies, and other financial institutions" with an employee who served as an insider-director to a corporation. Painter, *supra*, at 364.

A Special Study Group of the SEC considered these issues, among others, during the Special Study of Securities Markets.  *Id.*  The Special Study Group concluded that "the possibilities for abuse of the *Blau* doctrine by large investment firms were sufficiently grave to justify its legislative 'reversal.'"  *Id.* (quoting *Report of Special Study Group of Securities Markets*, H.R.

Doc. No. 95, 88th Cong., 1st Sess., pt. 3, at 64 (1963)).  But "[p]rior to 1964 the Securities Exchange Act did not extend to issuers whose securities were not listed on a national securities exchange."  Albert C. Bender, Note, *The § 16(d) Market-Making Exemption*, 18 Stan. L. Rev. 1418, 1420 (1966).  The Special Study Group's envisioned legislation, though, "extended the registration, periodic reporting, proxy solicitation, and insider-trading provisions of sections 12, 13, 14, and 16 of the [Exchange Act] to large issuers whose securities are traded over the counter." *Id.* at 1420-21.

"This legislation, absent any exemption, would have subjected many underwriting firms active in the over-the-counter market to insider-trading liability under section 16(b), because the distribution of new securities [was] accomplished primarily in that market."  *Id.* at 1421.  To "ameliorate the proposal's effect on accepted industry practices, the Special Study Group proposed limited *ad hoc* exemptions for so-called 'market-makers,' . . . particularly in small concerns which have just completed their first public offering," while eschewing a "general exemption for market-makers."  Painter, *supra*, at 364-65.  The Special Study Group's recommendations provided "the impetus necessary for passage" of the Amendments Act.  Richard M. Phillips & Morgan Shipman, *An Analysis of the Securities Acts Amendments of 1964*, 1964 Duke L.J. 706, 707 (1964).

The Special Study Group's proposed exemption for market makers proved to be "one of the most controversial portions of the Commission's legislative program."  *Id.* at 769 n.220.  While the SEC's draft legislation initially followed the Special Study Group's recommendation that *ad hoc* exemptions for market makers be granted, "[a]fter discussions with representatives of the securities industry, the Commission agreed to a compromise suggested by them: [t]here would be a general marketmaker exemption, subject to the Commission's power to define the key terms and to prescribe terms and conditions limiting the exemption."  *Id.* at 770 n.220.  This change from the

Special Study Group's recommendation, at the urging of the securities industry, drew the ire of several members of the House of Representatives during the hearings on the Amendments Act. *See id.*; Painter, *supra*, at 366-71.  But ultimately, the Amendments Act codified the current language of Section 16(d).  The Second Circuit has observed that Section 16(d)'s exemption for OTC market making was intended to avoid "the threat [that Section 16(b)] liability would cause a reduction of the market-making activities of [certain] firms."  *C.R.A. Realty Corp. v. Tri-South Invs.*, 738 F.2d 73, 77 (2d Cir. 1984); *see also id.* ("In order to encourage market making by removing the § 16(b) threat, therefore, Congress adopted a proposal by the Commission for a general exemption for market-making activity . . . .").

Although the text of Section 16(d) permits the SEC to establish rules and regulations concerning the exemption, the SEC has never adopted a rule under Section 16(d).  In the history of the statute, the SEC has proposed only two rules, one which would have defined certain terms and established criteria for the existence of market-making activity, *see* Notice of Proposed Rule 16d-1 Under the Securities Exchange Act of 1934, Exchange Act Release No. 7905 (June 16, 1966), and another which would have exempted market makers that qualify under Section 16(d) from Section 16(a)'s disclosure requirements, *see* Ownership Reports and Trading by Officers, Directors and Principal Stockholders, Exchange Act Release No. 26333 (Dec. 2, 1988); Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 27148 (Aug. 18, 1989) (proposing the same rule with a typographic change).  Ultimately, the SEC did not adopt either of these proposed rules.  *See* Securities and Exchange Commission Release Notice, Release No. 8743 (Nov. 7, 1969); Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 17991 (Feb. 21, 1991).

B.    **Factual Background[2]**

1.    **Overview of HAP's Business**

HAP is a broker-dealer registered with the SEC.  56.1 Stmt. ¶ 1.  HAP's principal business is in making and maintaining markets in various securities, including options.  *Id.* ¶¶ 2, 4.  Market makers offer to buy or sell a given security when presented with orders from customers; this in turn provides liquidity to the market in that security.  *Id.* ¶¶ 73 n.74, 87.  A market maker profits from the "bid/ask spread," or "edge," which is the difference between the price to buy a security and the price to sell that security.  *Id.* ¶¶ 74, 83.  By engaging in repetitious business with customers, market makers expect to make profit across long periods of time buying and selling a given security.  *Id.* ¶ 85.  HAP's website and written supervisory procedures both identify HAP's market-making activities, including holding out the business as "a liquidity and efficiency provider to the marketplace," whose portfolio managers "speed the market price discovery process."  *Id.* ¶¶ 79-81.  HAP is registered as a market maker on some options exchanges, though it is not registered as a market maker on many other exchanges.  Daichman Decl., Exh. K ("Lundelius Rebuttal Report") ¶¶ 44-49.

---

[2]  The facts throughout this Opinion and Order are drawn from HAP's statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 97 ("56.1 Stmt."), Clarus's counterstatement under Local Civil Rule 56.1(b), Dkt. 105, and the exhibits filed by the parties.  Unless otherwise noted, the Court cites only to HAP's statement of undisputed material facts when Clarus does not dispute the fact, has not offered admissible evidence to refute it, or seeks to add its own "spin" on the fact or otherwise disputes the inferences drawn from it.

Among the exhibits filed by the parties were excerpts from the transcripts of several depositions conducted during discovery.  Those deposition transcript excerpts are referred to herein as follows: (1) Dkt. 98 ("Conn Decl."), Exh. 6, and Dkt. 103 ("Daichman Decl."), Exh. A, collectively as "Evans Dep. Tr."; (2) Conn Decl., Exh. 40, and Daichman Decl., Exh. E, collectively as "Joseph Dep. Tr."; (3) Conn Decl., Exh. 7, as "Padia Dep. Tr."; and (4) Conn Decl., Exhs. 31, 32, collectively as "Lundelius Dep. Tr."

OTC trading involves trading securities via a broker-dealer network, such as through chat applications, as opposed to a centralized exchange like the New York Stock Exchange ("NYSE"). 56.1 Stmt. ¶ 92.  Matthew A. Evans, HAP's proffered expert in global financial markets, explained at his deposition that, although the specifics of each national centralized exchange differ, national exchanges will use a "many-to-many" auction process in which "many buyers come in and place their orders to buy into a centralized computer that will process those orders and give them priority," and then distribute to the market information of "the best bid price that anyone in the market can trade on if they want to sell."  Evans Dep. Tr. at 27:18-28:2.  The exchange will simultaneously take sell orders from other market participants and, after processing the orders and determining priority, will convey to the market "the best offer to sell amongst all of [the] competing offers."  *Id.* at 28:3-8.  Exchanges "continuously run that auction to create a best bid from many participants, a best offer from many participants, and then any trades that execute in that environment will automatically get routed through downstream trade reporting, processing, clearing, and settlements processes."  *Id.* at 28:9-15; *see id.* at 29:5-12 (explaining that this many-to-many auction process is "almost universal" to every national exchange with "smaller tweaks and rules and differences" about order types and priority).  Market-making firms can have their trades routed on the exchange directly through the exchange's best bid and offer process or they can negotiate their trades in the OTC market and port them into the exchange's reporting, clearing, and settlement mechanisms.  *Id.* at 26:7-19.

As part of its market-making business, HAP would enter into packaged trades with brokers. 56.1 Stmt. ¶ 38.  To begin this process, a broker would approach HAP to inquire whether HAP was interested in entering into a packaged trade.  *Id.*  These packaged trades contained interrelated component transactions in multiple individual securities, referred to as "legs."  *Id.* ¶ 18.  Each leg

was a buy or sell trade in calls, puts, or common stock.  Daichman Decl., Exh. L ("Evans Report") ¶ 60.[3]  For example, HAP would enter into conversions (a strategy in which a trader simultaneously sells a call option, buys a put option with the same strike price and maturity date, and buys the underlying stock) and reverse conversions (the mirror opposite of this trade, where a trader simultaneously buys a call option, sells a put option with the same strike price and maturity date, and sells the underlying stock).  *See id.* ¶¶ 22-23; Daichman Decl., Exh. M ("Padia Decl.") ¶ 17 (explaining that HAP's "packaged trades included 'reverse conversion arbitrage' and 'conversion arbitrage' transactions in Clarus securities").  Among other strategies, HAP also executed "calendar spreads," in which it "purchased call options and sold call options at different maturities while simultaneously buying or selling Clarus stock."  *See* Evans Report ¶ 62; Lundelius Rebuttal Report ¶ 12; *see also* Padia Decl. ¶¶ 17-20 (explaining these strategies).  The record in this case contains several chat logs in which HAP's traders negotiated packaged trades with brokers.  *See* Padia Decl. ¶¶ 29-71 (outlining examples of executed trades, including the relevant chat logs); Conn Decl., Exhs. 3, 4, 5 (records of chat conversations between HAP and brokers regarding packaged trades).  HAP's packaged trades included legs of both stock and options, which are not traded on the same exchange.  56.1 Stmt. ¶ 95.  These trades, as a package, thus could not be found on a national exchange, although each individual leg was "printed" on an exchange, meaning the leg used the exchange for certain processes, including order submission, execution, clearing, and confirmation.  *Id.* ¶¶ 46, 96; *see* Evans Dep. Tr. at 105:2-15 (testifying that a trade must be "printed" in order for it to go through; otherwise, it is an "out trade" which is not credited).

---

[3] A call option is a contract that gives the buyer the right to buy an asset at a specific "strike price" by a specific expiration date.  56.1 Stmt. ¶ 6.  A put option conversely gives a buyer the right to sell an asset at a specific strike price by a specific expiration date.  *Id.* ¶ 7.

Upon the broker's inquiry, HAP would respond with an "executable price," which would convey the particular price or parameters to which HAP would agree for such a trade. 56.1 Stmt. ¶ 39. HAP and the broker would then negotiate the elements of the potential trade, including prices, quantities, strike prices, and expiry dates. *Id.* ¶ 40. These discussions would occur via phone and chat application communications. *Id.* ¶¶ 41, 86. Once the parties finalized all the terms of the trade, the broker would take HAP's bid for the packaged trade and receive final approval from the customer. *Id.* ¶ 42. The broker would indicate approval to HAP by sending the terms of the packaged trade, including each leg, to HAP through text message. *Id.* ¶¶ 43-44. At this stage in the transaction, the broker would go to the securities exchange where the securities for each leg were listed. *Id.* ¶ 45. The broker would then print each leg of the packaged trade on an exchange. *Id.* ¶ 46.

An option holder bears the risks associated with changes in the option's value. *Id.* ¶ 9. One risk is a change in option value with respect to the underlying stock price, referred to as "delta" risk. *Id.* ¶ 10. Delta is a measure of the sensitivity of an option's price to a change in the price of the underlying asset. *Id.* ¶ 12. A trader can mitigate this risk by holding options in the same underlying security with equal and offsetting deltas, such that the delta of the trader's net position is zero. *Id.* ¶ 13. A position with zero delta at a given time is called a "delta neutral" position, which is also referred to as "delta hedged." *Id.* ¶ 14. Since the values of the underlying security and any options on that security fluctuate with market developments and time, a trader seeking to mitigate their delta risk can continuously delta hedge by buying or selling stocks, call options, or put options, such that their portfolio is kept approximately delta neutral. *Id.* ¶¶ 15-16. HAP claims that it would delta hedge its portfolio for risk management purposes. *Id.* ¶¶ 120, 131.

### 2.  HAP's Trading in Clarus Securities

Clarus is a public company that manufactures and distributes outdoor equipment.  *Id.* ¶ 3.
From July 19, 2022, through September 16, 2022, HAP traded in Clarus securities, including
common stock, call options, and put options.  *Id.* ¶¶ 5, 8.  During this time, Clarus stock
experienced a period of high volatility, including sharp increases and decreases in price and a stark
increase in trading volume.  *Id.* ¶¶ 49-50.[4]

HAP began market making in Clarus securities when two brokers approached HAP to enter
into packaged trades.  *Id.* ¶ 54; *see id.* ¶ 55 (stating that HAP did not approach the brokers to trade
in Clarus securities).  Two HAP executives—Padia and Michael Joseph, HAP's Chief Operating
Officer, Chief Financial Officer, and Chief Compliance Officer—testified at their depositions
about these packaged trades and explained that they were associated with HAP's market-making
business.  *See* Joseph Dep. Tr. at 72:12-73:13 (explaining that HAP's stock trading was "related
to option transaction packages" and that as an "OTC market maker, [HAP does] things called
package trades where it's a combination of a multi-leg trade that are brokered over the phone or
through the instant messaging platforms"); *id.* at 109:15-21 (explaining that HAP "trade[s] based
on the order flow that customers, brokers bring to us" and "[w]e don't initia[te] positions, they
bring the trades to us and as a result of those trades, we had a beneficial ownership percentage [in
Clarus]"); Padia Dep. Tr. at 78:9-13 ("Generally, most of our trades are market making trades
because they are being brought to us, and we're making these markets based on what we view as

---

[4] HAP claims that this volatility was most likely due to the trading of TT Investimentos, a
Brazilian investment fund that was Clarus's largest shareholder at the time and which press reports
indicate subsequently closed due to its Clarus-based trades.  56.1 Stmt. ¶¶ 51, 62; *see also id.*
¶¶ 56-60, 63-67 (providing other examples of sources speculating that TT Investimentos was the
cause of the volatility in Clarus stock).  The cause of the volatility in Clarus stock during this time
is immaterial to the resolution of this matter.

arbitrage principles.").  HAP's transactions in Clarus securities occurred in the ordinary course of its business and HAP never held Clarus securities in an investment account.  56.1 Stmt. ¶¶ 76-77.

HAP claims that the "vast majority" of its trading in Clarus securities was packaged trading.  *Id.* ¶ 17; *see also* Conn Decl., Exh. 1 ("Overdahl Report") ¶ 61.  Clarus's proffered expert disputes that characterization, noting that "[p]ackaged trades . . . account for only 370 of the 33,216 trades" in Clarus stock.  *See* Lundelius Rebuttal Report ¶ 13.  HAP counters that it "is misleading[]" to "treat[] every entry in HAP's trade files as a separate trade, whether that entry reflects a transaction to purchase one share or 500,000 shares," and points out that one of its own experts "calculated that about 86% of HAP's trades were part of packaged trades."  Dkt. 111 ("Reply") at 3-4 n.3.

Regardless of how the packaged trades are characterized, HAP's experts also maintain that HAP executed non-packaged trades for the purpose of hedging the risk that HAP assumed in the packaged trades.  *See* Overdahl Report ¶ 88; Evans Report ¶ 85.  HAP contends that these trades reflected delta hedging.  *See* 56.1 Stmt. ¶ 20; Padia Decl. ¶ 21 (explaining that HAP's hedging trades in Clarus common stock and options were "to ensure that HAP's overall portfolio remained delta neutral" and that these hedging trades were "incidental to" HAP's OTC market making).  But Clarus's expert concluded that "HAP's trading strategies for [Clarus] securities appear to be partial hedging, which allows HAP to bet on [Clarus] stock movements with some downside protection." Lundelius Rebuttal Report ¶ 32.

On September 15, 2022, HAP filed two Schedule 13G disclosures with the SEC.  56.1 Stmt. ¶¶ 68-72; *see* Daichman Decl., Exh. AA ("Lundelius Report") ¶ 10.  The SEC requires a Schedule 13G disclosure to be filed within forty-five days after the end of a calendar quarter when the reporting entity has acquired beneficial ownership of more than 5% of a class of a company's

equity securities, or within five business days after the end of the first month in which the entity's beneficial ownership exceeds 10% of a class of a company's equity securities. 17 C.F.R. § 240.13d-1(b)(1)-(2). In its Schedule 13G disclosures, HAP reported that it beneficially owned up to 32.4% of Clarus common stock, including shares of common stock and call options. *See* Dkt. 103, Exhs. G, H.[5]

Both sides' experts agree that July 19, 2022, to September 16, 2022, is the period when HAP owned more than 10% of Clarus common stock, thus generally triggering an obligation to disgorge short-swing profits made during that period under Section 16(b), although the parties of course dispute whether an exception to this disgorgement requirement applies. *See* Daichman Decl., Exh. BB ("Lundelius Additional Report") ¶¶ 4, 10; Overdahl Report ¶ 11 & n.6. Clarus's expert calculates $56,897,690 in short-swing profits during this time. *See* Lundelius Additional Report ¶ 10.

## C.    Procedural History

On September 23, 2022, Clarus initiated this action against HAP. Dkt. 1. Clarus's Complaint asserts a single claim under Section 16(b) of the Exchange Act, seeking disgorgement of HAP's short-swing profits. *Id.* ¶¶ 23-31. HAP's Answer asserts four affirmative defenses, including that these transactions qualify for the exception under Section 16(d) for transactions made by OTC market makers. Dkt. 36 at 5-6. Discovery closed on March 6, 2024. *See* Dkt. 79. On May 9, 2024, HAP moved for summary judgment on, *inter alia*, its Section 16(d) defense. *See* Dkts. 95-98. Clarus filed its opposition on July 9, 2024, Dkts. 103-105, and HAP filed a reply on

---

[5] The parties appear to agree that HAP's disclosure under Schedule 13G was late. *See* Dkt. 104 ("Opposition") at 4-5; Joseph Dep. Tr. at 81:8-82:9 (testifying that HAP "did not meet th[e] obligation" to file a Schedule 13G disclosure and that this "was an oversight").

August 9, 2024, Dkts. 111-112.  The Court heard oral argument on HAP's summary judgment motion on February 11, 2025.  Dkt. 114 ("Oral Arg. Tr.").

## II.  Subject Matter Jurisdiction

Before delving into the merits of HAP's motion for summary judgment, the Court first addresses HAP's challenge to the Court's subject matter jurisdiction.  HAP argues that Clarus lacks standing to bring a suit under Section 16(b) because it cannot demonstrate evidence of a direct injury-in-fact, aside from a statutory violation.  Motion at 34-35.  HAP primarily relies on the district court's decision in *Packer v. Raging Capital Management, LLC*, 661 F. Supp. 3d 3 (E.D.N.Y. 2023), which held that the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), abrogated the Second Circuit's decision in *Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170 (2d Cir. 2012) (holding that a Section 16(b) plaintiff does not need to establish a direct injury to have standing).

As Clarus notes, Opposition at 23, the Second Circuit has since reversed the district court in *Packer* and held that *Donoghue*'s analysis remains valid post-*TransUnion*.  *See Packer*, 105 F.4th at 56.  Perhaps recognizing that its challenge to the Court's subject matter jurisdiction was undermined by the Second Circuit's decision in *Packer* (which was decided after HAP filed its motion for summary judgment), HAP's Reply essentially abandons this argument.  Instead, HAP notes the recent decision in *Packer* and points to another Second Circuit appeal raising the same issue, *Microbot Medical, Inc. v. Mona*, No. 24-559-cv (2d. Cir.), and advises that HAP will "keep the Court apprised if any developments in these cases and other decisions would support Defendants' argument that this Court lacks subject matter jurisdiction."  Reply at 10 n.14.

On January 22, 2025, the Second Circuit issued a summary order in *Microbot Medical*, holding that it was "bound by [the Second Circuit's] well-reasoned precedents in *Packer* and

*Donoghue*" and affirming the district court's denial of a motion to dismiss for lack of Article III standing. *Microbot Med., Inc. v. Mona*, No. 24-559-cv, 2025 WL 262590, at \*1 (2d Cir. Jan. 22, 2025) (summary order). Accordingly, this Court remains bound by *Donoghue*, which compels the rejection of HAP's subject matter jurisdiction challenge. *See Donoghue*, 696 F.3d at 180 (explaining that Section 16(b) "created legal rights that clarified the injury that would support standing, specifically, the breach by a statutory insider of a fiduciary duty owed to the issuer not to engage in and profit from any short-swing trading of its stock"). The Court therefore turns to the merits of the parties' dispute.

### III.  Legal Standard

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at \*4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence

sufficient to satisfy every element of the claim.'" *Chen*, 2019 WL 1244291, at *4 (quoting

*Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on

conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence

showing that its version of the events is not wholly fanciful." *Jeffreys v. City of New York*, 426

F.3d 549, 554 (2d Cir. 2005) (internal quotation marks omitted).  The non-movant must present

more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252.

"Where no rational finder of fact 'could find in favor of the nonmoving party because the evidence

to support its case is so slight,' summary judgment must be granted." *Brown v. Eli Lilly & Co.*,

654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586).

## IV.  The Law of Section 16(d)

HAP does not seriously contest that Clarus has asserted a *prima facie* claim for a Section

16(b) violation.[6]  "For liability to attach to a short-swing trade under Section 16(b), a plaintiff must

prove that 'there was [i] a purchase and [ii] a sale of securities [iii] by an [insider] [iv] within a

six-month period.'" *Y-mAbs Therapeutics*, 2024 WL 3675716, at *7 (quoting *Chechele v.

Sperling*, 758 F.3d 463, 467 (2d Cir. 2014)) (alterations in *Y-mAbs Therapeutics*).  The parties

agree that HAP purchased and sold Clarus securities between July and September 2022, and that

HAP was a statutory "insider" by virtue of its beneficial ownership of more than ten percent of

---

[6] HAP does challenge whether Clarus can establish damages.  Motion at 35.  But that argument is explicitly predicated on the Court granting either of HAP's motions to exclude the opinion of Clarus's expert, Mr. Lundelius.  *Id.* (arguing that "if this Court grants either of Defendants' motions to exclude Lundelius' opinion, this Court should enter summary judgment against Clarus for failure to establish its entitlement to any short-swing profits").  As explained at *supra* n.1, the Court denies those motions as moot, given the Court's conclusion that HAP's relevant purchases and sales of Clarus securities fall under Section 16(d)'s exception.  For the same reason, the Court does not reach HAP's argument that Clarus fails to establish damages.

17

Clarus stock.  Liability therefore turns on whether HAP's trading falls within one of the statutory exceptions to Section 16(b).

For purposes of the Court's holding, the relevant exception is found at Section 16(d) of the Exchange Act, 15 U.S.C. § 78p(d).  *See supra* I.A.2.  Many decades ago, the Honorable Abraham D. Sofaer of this District noted the "remarkable dearth of either regulatory or judicial guidance" concerning Section 16(d).  *C.R.A. Realty Corp. v. Tri-South Invs.*, 568 F. Supp. 1190, 1192 (S.D.N.Y. 1983); *see also id.* at 1993 n.1 (observing that "no reported cases interpreting the exception ha[d] been found [in 1983], a notable occurrence in the highly litigated securities field"). Perhaps even more remarkably, the same can be said over forty years later.  Just two cases from this Circuit—Judge Sofaer's opinion in *C.R.A. Realty* and the Second Circuit's opinion on appeal of that decision, *see C.R.A. Realty Corp.*, 738 F.2d 73—have seriously confronted the meaning and scope of Section 16(d).

As far as this Court can tell, only the Fifth Circuit has otherwise analyzed the Section 16(d) exception, albeit minimally and over fifty years ago.  *See Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 885-86 (5th Cir. 1973); *see also In re Section 16(b) Litig.*, 602 F. Supp. 2d 1202, 1208 n.8 (W.D. Wash. 2009) (referencing the basics of the exception).  The SEC has issued a small amount of interpretive administrative guidance regarding Section 16(d), which is discussed in greater detail below.  *See infra* IV.B.  Securities law treatises similarly reflect the dearth of authority in the area.  *See, e.g.*, 5A Arnold S. Jacobs, *Disclosure and Remedies Under the Securities Laws* § 4:226 (Dec. 2024); 4 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 13:37 (Nov. 2024); Marc. I. Steinberg, *Securities Regulation: Liabilities and Remedies* § 4.02 n.89 (Dec. 2023); 2 Peter J. Romeo & Alan L. Dye, *Section 16 Treatise and Reporting Guide: Insider Reporting and Short-Swing Liability* § 15.02 (6th ed. 2024).

Given the lack of authority on Section 16(d), the Court will first provide an overview of the relevant sources of authority on the exception and the legal principles they express.  After this discussion, the Court will turn to the parties' arguments about the exception's applicability in this case.

## A.    *C.R.A. Realty Corporation*

The Second Circuit's decision in *C.R.A. Realty Corporation* is the primary source of authority concerning Section 16(d).  *C.R.A. Realty* was a shareholder derivative Section 16(b) suit brought principally against Drexel Burnham Lambert, Inc. ("Drexel"), concerning Drexel's trading in securities of Tri-South Investments ("TSI").  738 F.2d at 74.  TSI "had three classes of securities, each listed and traded on a national securities exchange: a common stock, a 7% convertible subordinated debenture, and a 10% convertible debenture.  The debentures were convertible at the option of their holders into shares of TSI common stock without the payment of additional consideration."  *Id.*  Drexel was a broker-dealer which owned more than 10% of TSI common stock and held itself out to be a market maker in TSI convertible debentures, though it was not a market maker in TSI common stock.  *Id.*  Between June 1979 and November 1981, Drexel made purchases and sales of each class of TSI securities within periods of less than six months.  *Id.*  C.R.A. Realty Corporation ("CRA") brought suit under Section 16(b) as a shareholder of TSI, seeking to recover Drexel's short-swing profits.  *Id.*

The district court granted Drexel's motion for summary judgment, applying Section 16(d)'s exception for OTC market making.  *C.R.A. Realty Corp.*, 568 F. Supp. at 1193-94.  On appeal, the Second Circuit invited the SEC to file an *amicus curiae* brief addressing the applicability of that exemption, and the Second Circuit's opinion ultimately adopted the SEC's view that Section 16(d) reached Drexel's activities.  *C.R.A. Realty Corp.*, 738 F.2d at 76.  The

Second Circuit rejected CRA's argument that Section 16(d) applies "only to the security in which the market making occurs," concluding that Section 16(d) "does not clearly have the meaning that CRA attributes to it," given that Section 3(a)(11) of the Exchange Act defines an equity security to encompass both stock and any securities convertible into stock.  *Id.* at 77.  Absent "a clearer expression" that Congress intended to impose Section 16(b)'s strict-liability regime on trades in common stock incident to market making in debentures, the Second Circuit declined to extend liability in the manner CRA wanted.  *Id.* (citing *Foremost-McKesson*, 423 U.S. 232).

Elaborating on this point, the Second Circuit explained that declining to adopt CRA's position was "consistent with both the realities of the marketplace and the congressional goal of facilitating market-making activity."  *Id.*  This was because "[m]arket makers in convertible securities frequently hedge their positions in the convertible by trading in the underlying common stock to avoid some of the risk inherent in market making," so "[a] dealer with substantial holdings of the convertible securities may sell the common stock short to offset risks of adverse market swings."  *Id.*  "An interpretation of § 16(d) that would exempt these common stock trades would encourage dealers to make markets in the convertible securities by permitting them to limit the risk inherent in holding a position in the convertible securities.  The more dealers that are willing to make markets in the convertible securities, the greater the depth and liquidity of those markets and the greater the competition."  *Id.*

The Second Circuit next dismissed CRA's prediction "that the exemption of a debenture market maker from § 16(b) liability for trading in the common stock into which the debenture is convertible will lead to rampant pernicious insider trading in common stock by these broker-dealers."  *Id.* at 78.  The court explained that "[t]he exemption provided by § 16(d) extends only to trading that is 'incident to' market-making activity.  Thus, only common stock trades directly

related to the market-making activity in the convertible securities would be found exempt from § 16(b)." *Id.*

Finally, the Second Circuit rejected CRA's argument that summary judgment was not appropriate because a genuine dispute of material fact existed about whether Drexel was a market maker in TSI debentures to begin with. In connection with its opposition to Drexel's summary judgment motion, CRA "contend[ed] that Drexel had not consistently been a market maker in the convertible securities during the period in question . . . present[ing] affidavit evidence that Drexel had listed itself in an inter-dealer quotation service published daily by The National Quotation Bureau, and known informally as the 'Yellow Sheets,' as a market maker in the convertible debentures only on certain dates and not on others." *Id.* at 74. Drexel presented affidavits from its own employees and other independent broker-dealers that stated "notwithstanding the Yellow Sheets, Drexel had in fact at all pertinent times held itself out to other dealers as willing to buy and sell TSI convertible debentures for its own account at reasonable prices on a regular and continuous basis." *Id.* at 75.

The Second Circuit concluded that whether Drexel inconsistently listed itself as a market maker in the Yellow Sheets was immaterial. *Id.* at 78. Instead, Drexel's submitted affidavits "established that a firm can be a market maker without so stating in the Yellow Sheets." *Id.* The Second Circuit explained that "Drexel's employees' affidavits stated that for the entire period in question Drexel had in fact held itself out as willing to buy and sell TSI convertible debentures for its own account on a regular and continuous basis. The affidavits by broker-dealers other than Drexel confirmed this statement and showed that these firms had dealt with and recognized Drexel on this basis." *Id.* As CRA had not offered evidence that Drexel was not viewed as a market maker, there was no dispute of material fact to preclude summary judgment. *Id.* at 78-79.

*C.R.A. Realty* teaches a few lessons important here. First, the Second Circuit extended the Supreme Court's admonition in *Foremost-McKesson* that "[i]t is inappropriate to reach the harsh result of imposing § 16(b)'s liability without fault on the basis of unclear language," 423 U.S. at 252, to the Section 16(d) context. *See C.R.A. Realty Corp.*, 738 F.2d at 77. *Foremost-McKesson* ruled that Section 16(b) must clearly and expressly apply in order for a plaintiff to make out a case for strict liability under the statute. 423 U.S. at 252 (holding that Section 16(b) liability must be "express[] or . . . unmistakable" for strict liability to attach). Section 16(d) is an *exception* to Section 16(b). It does not obviously follow that a defendant against which an unambiguous *prima facie* short-swing trading case has been made out can defeat the Section 16(b) strict-liability regime upon showing ambiguity as to whether an exception applies. *See, e.g.*, *Rosen v. Brookhaven Cap. Mgmt., Co., Ltd.*, 194 F. Supp. 2d 224, 228 (S.D.N.Y. 2002) (explaining that courts have "specifically held in the securities context that defendants have the burden to plead and prove statutory exemptions"). But *C.R.A. Realty* made clear that *Foremost-McKesson*'s logic applies in the Section 16(d) context. Under *C.R.A. Realty*, when a defendant invokes Section 16(d) as a defense from Section 16(b) liability, it is shielded from liability unless Section 16(d) unambiguously does not cover its activities. 738 F.2d at 77 (declining to impose liability because "§ 16(d) does not clearly have the meaning that CRA attributes to it" and demanding "a clearer expression by Congress of an intention to impose strict § 16(b) liability" to the activities of a defendant invoking Section 16(d)). Thus, a defendant who shows that it is not clear whether its activities fall within the exception generally should be entitled to protection under Section 16(d).

Second, the Second Circuit explained in *C.R.A. Realty* that Section 16(d) should be interpreted to be consistent with "the realities of the marketplace and the congressional goal of facilitating market-making activity." *Id.* This includes applying the exception where market

makers are "hedg[ing] their positions in the convertible by trading in the underlying common stock to avoid some of the risk inherent in market making." *Id.*  Applying the exception in that context, the Second Circuit explained, "would encourage dealers to make markets in the convertible securities by permitting them to limit the risk inherent in holding a position in the convertible securities," therefore promoting Congress's ultimate goal of creating greater depth, liquidity, and competition in these markets. *Id.*

Third, *C.R.A. Realty* establishes a test for what kinds of transactions fall within Section 16(d)'s "incident to" language.    In rejecting CRA's policy argument, the Second Circuit emphasized that the exception covers only "trading that is 'incident to' market-making activity. Thus, only common stock trades *directly related to the market-making activity* in the convertible securities would be found exempt from § 16(b)." *Id.* at 78 (emphasis added).  This direct-relation test imposes a boundary on what kinds of transactions can fall within the exception; it may be that a market maker conducts some hedging transactions that are directly related to hedging its market-making risk, while it conducts other transactions in a company's securities that are not directly related to its market-making activities.  Only the former would fall within Section 16(d)'s ambit, and a plaintiff may still recover profits from the latter transactions under the short-swing profit rule.

Fourth, *C.R.A. Realty*'s disregard of the Yellow Sheets demonstrates that it is not necessary for a firm to have certain formalistic hallmarks of an OTC market maker to qualify for the Section 16(d) exception.  Instead, what matters is whether the firm "had in fact held itself out as willing to buy and sell [a company's securities] for its own account on a regular and continuous basis." *Id.* at 78.  Evidence that other market participants "dealt with and recognized" the firm as a market maker is sufficient by itself to show that the firm is a market maker. *Id.*

*C.R.A. Realty* thus provides guidance in a situation where a market maker is operating in two markets: an OTC market and a national securities exchange. *C.R.A. Realty* makes clear that a market maker which uses the facilities of a national securities exchange to execute trades can still qualify for the protection of Section 16(d). But that protection requires two conditions precedent: (1) the market maker must be engaging in other OTC market-making activities and (2) the trades utilizing the facilities of the national securities exchange must be "incident to" those OTC market-making activities. With these lessons in mind, we turn to the limited additional sources of guidance concerning the Section 16(d) exception.

**B.    The Securities and Exchange Commission's Interpretations**

Despite the lack of judicial authority in this area, a handful of SEC interpretations shed light on the scope of Section 16(d). "While SEC no-action letters are not binding on New York courts, they are widely regarded as persuasive authority." *Schatzki v. Weiser Cap. Mgmt., LLC*, No. 10 Civ. 4685 (RWS), 2016 WL 6662264, at *5 (S.D.N.Y. Nov. 9, 2016) (collecting cases); *see Gryl ex rel. Shire Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 145 (2d Cir. 2002) ("SEC no-action letters . . . are entitled to no deference beyond whatever persuasive value they might have."); *Amalgamated Clothing & Textile Workers Union v. Sec. & Exch. Comm'n*, 15 F.3d 254, 257 (2d Cir. 1994) ("Although courts may find SEC positions on enforcement as articulated in no-action letters persuasive in the circumstances, such positions are not binding on the district courts."). Although the parties make no reference to the SEC's interpretations of Section 16(d), given the dearth of authority addressing the exception, the Court looks at these interpretations for their possible persuasive value in assessing the parameters of Section 16(d) and its application to HAP's activities.

In its no-action letter in *Prudential-Bache Securities, Inc.*, SEC Staff No-Action Letter, 1985 WL 55643 (Dec. 2, 1985), the SEC maintained that "purchases and sales of securities in the ordinary course of marketmaking by a broker-dealer are not required to be reported pursuant to Section 16(a) of the Securities Exchange Act of 1934," based on the Section 16(d) exemption. *Id.* at *1. This was consistent with the position that the SEC took in its *amicus curiae* brief in *C.R.A. Realty*, which read the history of the Amendments Act to indicate that "Congress intended a broad exemption for market-making activity when it enacted Section 16(d)." Brief of Securities and Exchange Commission, *C.R.A. Realty Corp. v. Tri-South Invs.*, No. 83-7798 (2d Cir. 1983), at 7. The SEC's position, which the Second Circuit ultimately adopted, was that hedging trades in common stock fell within the Section 16(d) exception insofar as they were "a part of the dealer's activities in establishing or maintaining a primary or secondary over-the-counter market." *Id.* at 10. The SEC's brief in *C.R.A. Realty* expressed the agency's view that "stock trades on the opposite side of the market to hedge market-maker positions would be exempt from Section 16(b). Similarly, conversions and subsequent sales in the more liquid equity markets when the market maker cannot reduce a large position in the convertible acquired as a direct result of his market-making activity would also be exempt." *Id.* at 10-11. This is because these trades are all "incident to" the dealer's market-making activity. *Id.*

The SEC confronted a more complex issue in *The Nomura Securities Company, Ltd.*, SEC Staff No-Action Letter, 1990 WL 287048 (Nov. 1, 1990). The *Nomura Securities* no-action letter responded to a request for an interpretation of Section 16(d) as applied to secondary market transactions by The Nomura Securities Co., Ltd. ("Nomura") in securities issued by the Jakarta Growth Fund, Inc. ("Jakarta"). Nomura was a statutory insider of Jakarta and Jakarta's shares were listed on the NYSE. *Id.* at *1-2. After the termination of Jakarta's initial public offering,

Nomura anticipated that Japanese investors would "have the opportunity to acquire shares of [Jakarta] in secondary market transactions," and Nomura "propose[d] to buy from and sell to its customers in Japan as principal to meet their liquidity and investment needs." *Id.* at *2. If Nomura needed additional Jakarta shares to satisfy its Japanese customers, and those shares were not immediately available to it as a result of sales from its Japanese customers, it "would place orders for such shares with [its affiliated underwriter], which would arrange for execution of such orders on an agency basis (for Nomura's account) on the floor of the NYSE." *Id.* Nomura noted that "[i]n some instances, Nomura would purchase shares through [the affiliated underwriter] on the floor of the NYSE in anticipation of customer demand rather than solely in response to specific customer orders." *Id.*

Nomura asked the SEC to adopt its view that Section 16(d) may apply to these proposed activities. *Id.* Nomura "recognize[d] that the fact pattern described" lacked the hallmarks of "the traditional over-the-counter trading of a United States NASDAQ market maker in a number of ways," including that "some purchase or sale transactions on behalf of Nomura may be executed on the floor of the NYSE; Nomura's transactions as principal will be with customers in Japan rather than in the inter-dealer market; [and] no inter-dealer quotation system will be used in Tokyo." *Id.* at *4.

The SEC's letter in response indicated that it concurred in Nomura's interpretation, and "particularly note[d Nomura's] representations as to the following matters: (1) transactions in [Jakarta] shares to be executed on [Nomura's] behalf on the NYSE will be in connection with [Nomura]'s ordinary course of business in meeting its customers' demands for [Jakarta] shares in the over-the-counter market in Tokyo; (2) any transaction executed on [Nomura]'s behalf on the NYSE will be solely in response to actual or anticipated demand of its customers for [Jakarta]

26

shares in Tokyo, thereby permitting prompt execution of customers' orders at specific prices; and (3) [Jakarta] shares purchased on [Nomura]'s behalf on the NYSE will be held in a [Nomura] account to be used solely for providing liquidity to the over-the-counter market in Fund shares in Tokyo, and not for investment." *Id.* at \*1.  The SEC also "assumed that transactions on the NYSE made in response to anticipated customer demand will be based upon a reasonable and good faith estimate of that demand." *Id.*

    *Nomura Securities* took *C.R.A. Realty* to its logical conclusion.  In *C.R.A. Realty*, Drexel's transactions on the national securities exchange were common stock trades which the Second Circuit held were "incident to" its OTC market making in convertible debentures.  738 F.2d at 77.  *C.R.A. Realty* blessed Section 16(d) coverage for transactions in one security wholly conducted on a national securities exchange, so long as those transactions are "incident to" a firm's OTC market making in a different convertible security in the same issuer.  *See* 738 F.2d at 77-78.  *Nomura Securities* extended this premise to cover a situation where a transaction on a national securities exchange is made for the purpose of effecting liquidity in the OTC market—even if the same share of stock which crossed the floor of the national exchange is used in the OTC market-making activities.

    The SEC further addressed its position in *Nomura Securities* in 1991 when it declined to adopt one of the two aforementioned rules proposed under Section 16(d).  Ownership Reports and Trading By Officers, Directors and Principal Security Holders, 56 Fed. Reg. 7242, 7259 (Feb. 21, 1991) (the "1991 Release"); *see supra* I.A.2.  In a release, the SEC stated that "questions have been raised concerning the applicability of section 16(d) to transactions on a national securities exchange that are incident to over-the-counter market making activities.  Persons making a market on a national securities exchange are not eligible for the section 16(d) exemption."  1991 Release

at 7259.  The SEC noted that its staff in *Nomura Securities* had interpreted Section 16(d) "to exempt purchases and sales of closed-end fund shares by an affiliated market maker for its trading account even though the shares may be purchased on a national securities exchange, if the transactions occur in the ordinary course of business for the purpose of maintaining a foreign over-the-counter market for the securities and the purchases and sales are in response to actual or anticipated demand of its customers in the foreign market."  *Id.*

While *Nomura Securities* dealt with a foreign marketplace, the 1991 Release concerned itself with domestic transactions.  The SEC stated that "[t]his interpretation is extended to transactions, *even those made on a national securities exchange*, that are incident to the establishment or maintenance of a *domestic or foreign over-the-counter market*, provided that the transactions are in the ordinary course of the dealer's business in providing liquidity in the over-the-counter market and the securities purchased on a national securities exchange are held in the dealer's trading account to be used solely for providing liquidity and not for investment."  *Id.* (emphases added).

Following the 1991 Release, the SEC again dealt with the applicability of Section 16(d) to transactions effected on a national securities exchange in its 1992 interpretive letter in *Morgan Stanley & Company, Inc.*, SEC Interpretive Letter, Fed. Sec. L. Rep. P. 76, 292, 1992 WL 316358 (Nov. 19, 1992).  Morgan Stanley requested the SEC's formal interpretation of Section 16(d) as related to transactions in the shares of multiple closed-end management investment companies, the shares of which were listed on the NYSE.  Morgan Stanley was a statutory insider of the funds and thus subject to Section 16.  *Id.* at *1-2.  Morgan Stanley had been "frequently solicited by holders or potential purchasers of large positions (i.e., in excess of 10,000 shares) ('block positions') to sell, or purchase, such shares at the then current market price, or a price related thereto."  *Id.* at *3.

28

Morgan Stanley noted that "[b]lock positions due to their size ordinarily require slightly off-market prices in order to effect the entire transaction at the same price." *Id.* Morgan Stanley explained that "[a]s is frequently the case with block positions of any exchange-listed security, neither Morgan Stanley nor sellers or buyers of block positions believe that such positions may ordinarily be sold or acquired at a single price in normal exchange transactions. Accordingly, in order to facilitate the transaction and provide liquidity, Morgan Stanley and other block traders may agree to purchase or sell the block, whichever the case may be." *Id.*

Morgan Stanley sought to facilitate liquidity by engaging in block-positioning transactions in the funds. Morgan Stanley explained:

> In a typical block transaction in exchange-listed securities, Morgan Stanley is solicited by a seller to arrange the sale of, for example, 50,000 shares at a specified price. Morgan Stanley's block trading desk identifies prospective buyers of the shares through discussions with the exchange specialist and other dealers. As a result of such discussions, for example, 30,000 shares may be sold at the specified price to purchasers through the specialist and such dealers, leaving 20,000 shares remaining to be sold. Depending on its evaluation of the depth and general liquidity of the market, the historic volume and pricing characteristics of the particular securities and other factors that Morgan Stanley utilizes to manage its block positioning business, Morgan Stanley may determine to purchase the remaining 20,000 shares as principal. If so, the entire 50,000 shares are typically crossed on the exchange floor, with Morgan Stanley acting as agent in respect of 30,000 shares and principal in respect of 20,000. Morgan Stanley would then, as promptly as possible, resell the 20,000 shares into the market, typically in exchange transactions.

*Id.* Morgan Stanley "advised that the portion of a block acquired by Morgan Stanley as principal is ordinarily resold on the same day in as short a time as possible and, in any event, within a few days after the block was positioned." *Id.*

Morgan Stanley believed that "[i]n holding itself out as available to effect block transactions away from the NYSE to the extent necessary to fill the entirety of a block transaction through a purchase or sale as principal, Morgan Stanley is a 'market maker' in the over-the-counter market." *Id.* at *4. Morgan Stanley also thought that its "activities are clearly 'in the ordinary

course of business' and are believed to provide liquidity which is otherwise not effectively available on the NYSE." *Id.* Therefore, it sought the SEC's interpretation to confirm that the agency's position in *Nomura Securities* and its subsequent extension in the 1991 Release would apply to Morgan Stanley's block-positioning activities. *Id.*

In a subsequent letter to the SEC, Morgan Stanley explained that it sought interpretive advice "with respect to two different types of transactions." *Id.* at *6. The first was "with respect to block transactions a portion of which is effected on the NYSE. For example, in order to arrange for the sale of a block of 50,000 shares for an institutional investor, Morgan Stanley on an agency basis may effect the sale of 10,000 shares to or though a specialist on the NYSE and, having itself purchased the 40,000 shares as principal from the institutional investor, resell such shares to an investor, dealer or market maker off the NYSE." *Id.* Second was "with respect to block transactions in which the sale of all 50,000 shares are effected in transactions on the NYSE. Thus, as in the preceding example, 10,000 shares are sold on an agency basis to or through the specialist; the 40,000 shares which Morgan Stanley had acquired as principal are also sold in transactions effected through the NYSE; and none of the shares are sold off the NYSE." *Id.* Morgan Stanley explained that "[a]lthough in our example all of the sales would have occurred on the NYSE, we believe that the transactions should be exempt pursuant to Section 16(d) because they are incident to the maintenance of an over-the-counter market in which Morgan Stanley acts as a 'market maker' in block transactions." *Id.*

Additional correspondence indicates that the SEC informed Morgan Stanley of two concerns with these transactions: that the legislative history of Section 16(d) did not support Morgan Stanley's interpretation and that "the extension by the Commission of [*Nomura Securities*] applied only where the over-the-counter market was the 'primary' market for the securities." *Id.*

30

at *7. Responding to the latter point, Morgan Stanley explained that the 1991 Release "does not condition [the Section 16(d) exemption's] availability on the over-the-counter market being the 'primary' market for the securities, and the Commission's affirmation and extension of [*Nomura Securities*] indicates to the contrary." *Id.* at *8. In Morgan Stanley's view, *Nomura Securities* "indicates that the primary market for the shares of [Jakarta] was on the New York Stock Exchange, not in the over-the-counter market in Japan," and Morgan Stanley noted "that Section 16(d) by its terms does not require that the over-the-counter market be the primary market, and we are unaware of any authority so construing Section 16(d)." *Id.*

Ultimately, the SEC's staff was "unable to concur" in Morgan Stanley's interpretation of Section 16(d). *Id.* at *9. The staff took the view that "the described transactions by Morgan Stanley as principal in the Funds' shares are not incident to the maintenance by Morgan Stanley of a secondary market (otherwise than on a national securities exchange) for such securities, and accordingly, the exemption provided by section 16(d) would not be applicable to such transactions." *Id.*

Understanding the SEC's response in *Morgan Stanley* is challenging, as the staff's explanation was terse and lacked analysis of the relevant issues. The staff's view apparently was that *Nomura Securities* and the 1991 Release "applied only where the over-the-counter market was the 'primary' market for the securities," and therefore was unable to concur with Morgan Stanley's interpretation. *Id.* at *7. Although Section 16(d) speaks of the establishment or maintenance of a "primary or secondary market," it would seem the staff was using the term "primary" to mean "main," since Section 16(d) also affords protection to market-making activities in secondary markets. As Morgan Stanley persuasively argued, that interpretation is difficult to square with the staff's view in *Nomura Securities*, in which the NYSE served as the primary market for Jakarta's

securities.  But setting that issue aside, it is clear the staff had some concern with Morgan Stanley's proposal.  With these interpretations in mind, we turn to the case at hand.

## V.  Analysis

Section 16(d) exempts "any purchase and sale, or sale and purchase . . . of an equity security not then or theretofore held by him in an investment account, by a dealer in the ordinary course of his business and incident to the establishment or maintenance by him of a primary or secondary market (otherwise than on a national securities exchange or an exchange exempted from registration under section 78e of this title) for such security."  15 U.S.C. § 78p(d).  The parties do not dispute that HAP is a dealer, that HAP transacted in Clarus securities in the ordinary course of its business, and that HAP did not hold Clarus securities in an investment account.  *See* 56.1 Stmt. ¶¶ 75-77.

The parties' dispute, instead, revolves around three issues.  First, whether HAP acted as a "market maker" for purposes of the exception.  Second, whether HAP's utilization of the facilities of national securities exchanges to print many[7] of the individual legs of packaged trades disqualifies HAP from the exception.  Third, whether Section 16(d) applies to HAP's other trading activities in Clarus securities.  The Court addresses each issue in turn.

### A.    HAP Qualifies as a "Market Maker" for Section 16(d) Purposes

Both parties read Section 16(d) to cover only "market makers," as this term is defined in 15 U.S.C. § 78c(a)(38).  *See* Motion at 12; Opposition at 11.  That provision defines "market

---

[7] The record reflects, and the parties agree, that HAP's options legs were printed on national exchanges while stock legs were printed on regional exchanges.  *See* Joseph Dep. Tr. at 136:13-15 (explaining that for HAP's trades "the options print on the options exchange and the stock prints on the regional stock exchange"); *compare* Motion at 19 ("[T]he options legs print on an options exchange, while the stock legs print on a regional equities exchange."), *with* Opposition at 12 n.12 ("Joseph explained that HAP's options trading is executed on national exchanges, while its stock trading is executed on regional exchanges.").

maker," in relevant part, as "any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 78c(a)(38).  At oral argument, Clarus argued that HAP did not "enter[] quotations in an inter-dealer communications system or otherwise" with respect to Clarus securities, and therefore does not satisfy Section 3(a)(38)'s definition of "market maker." Oral Arg. Tr. at 25:13-29:24.  Clarus's opposition to HAP's motion for summary judgment, though, does not advance such an argument. *See generally* Opposition.  This argument is therefore forfeited. *See ABC v. Ironshore Specialty Ins. Co.*, 589 F. App'x 12, 13 (2d Cir. 2014) (summary order) (holding arguments not raised in an opposition forfeited).

Even setting aside the issue of forfeiture, Clarus's argument here is not persuasive.  To start, Section 16(d) does not even use the term "market maker."  It is thus not evident that the definition provided in Section 3(a)(38) can limit the category of defendants eligible for the Section 16(d) exception.  Although the Second Circuit in *C.R.A. Realty* quoted Section 3(a)(38) when interpreting Section 16(d), the court did not indicate that it understood Section 16(d)'s scope to be limited only to "market makers" that fall within Section 3(a)(38)'s definition. *See* 738 F.2d at 76.

Indeed, interpreting Section 16(d)'s reach to be confined to Section 3(a)(38)'s definition of "market maker" would be of dubious propriety, as "Congress added section 3(a)(38) to the Exchange Act eleven years after section 16(d)'s enactment." Arnold S. Jacobs, *An Analysis of Section 16 of the Securities Exchange Act of 1934*, 32 N.Y. L. Sch. L. Rev. 209, 695 (1987) (footnote omitted); *see also* Jacobs, *supra*, *Disclosure and Remedies Under the Securities Laws* § 4:226 ("Congress did not invoke the term 'market maker,' as defined in Section 3(a)(38) of the 1934 Act, when setting Section 16(d)'s boundaries.  This is understandable, for Congress added

Section 3(a)(38) to the Exchange Act eleven years after Section 16(d) was enacted.").  As a matter of textual interpretation, relying on a later-passed statute to interpret the meaning of Section 16(d) finds tension with the Supreme Court's "important caution" that it is "a fundamental canon of statutory construction that words generally should be interpreted as taking their ordinary meaning at the time Congress enacted the statute."  *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019).

Section 3(a)(38)'s definition, moreover, states that a "market maker" includes "any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis."  15 U.S.C. § 78c(a)(38).  By those terms, the definition of "market maker" is not restricted to dealers who "enter[] quotations in an inter-dealer communications system," as a dealer also can be a "market maker" for purposes of Section 3(a)(38) by "otherwise" "hold[ing] himself out . . . as being willing to buy and sell such security for his own account on a regular or continuous basis."  Clarus would read the statute in a more limited fashion, with "or otherwise" referring to only "in an inter-dealer communications system."  But the parenthetical containing "or otherwise" modifies the phrase "holds himself out," and "or otherwise" is best read to qualify that more capacious phrase.  A leading treatise on Section 16 confirms this understanding of the statute, stating that "[t]he fact that a dealer is not listed in an interdealer quotation system for a class of equity securities is not a barrier to reliance on the Section 16(d) exemption, so long as the dealer holds itself out as maintaining a market for the class."  Romeo & Dye, *supra*, § 15.02(3)(c).

As will be discussed at *infra* V.B.3, the undisputed evidence in the record reflects that HAP did hold itself out as being willing to continuously buy and sell Clarus securities for its own account and that other market participants treated HAP as a market maker in those securities.  *See*

56.1 Stmt. ¶¶ 75-77; Padia Decl. ¶¶ 2-4, 9-10.  Indeed, Clarus's own expert excluded some of HAP's trades from his damages calculation "to be conservative" because he concluded those trades were possibly made in HAP's capacity as a market maker.  Lundelius Report ¶ 20.  Clarus's argument that HAP fails to satisfy Section 3(a)(38)'s "market maker" definition as to its trading of Clarus securities is therefore unavailing.

Clarus also argues that HAP's transactions "lacked any of the hallmarks of OTC trading." Opposition at 14-15.  In support, Clarus points to the lack of an International Swaps and Derivatives Associates Master Agreement and the fact that the Options Clearing Corporation "served as the intermediary counterparty between buyer and seller in connection with HAP's trading of Clarus options," and argues that HAP "does not describe itself as engaged in OTC trading in any public or private documents."  *Id.*  Similarly, Clarus's expert notes that HAP is registered as a market maker on some options exchanges, but did not register as a market maker on many other exchanges.  Lundelius Rebuttal Report ¶¶ 44-49.

But these "indicia" are simply that—facts which might help prove that trades were conducted on exchanges, but which, like Drexel's Yellow Sheets listings, are not "material," insofar as HAP can demonstrate that market participants "dealt with and recognized" it as an OTC market maker and that HAP "in fact" operated in that capacity.  *C.R.A. Realty Corp.*, 738 F.2d at 78; *see also In re Sherman, Fitzpatrick & Co.*, 51 S.E.C. 1048, Release No. 33923, 1994 WL 148475, at *5 n.19 (Apr. 19, 1994) (contrasting *C.R.A. Realty* with a situation where the firm lacked any hallmarks of being a market maker and "the record d[id] not establish that other firms recognized it and dealt with it as a market maker").  Ultimately, these arguments largely come back to Clarus's lead point: HAP used national exchanges to print many of the legs of packaged trades.  The Court addresses this point next.

**B.    HAP's Market Making of Packaged Trades for Clarus Securities Qualifies for Section 16(d)'s Exception**

The crux of this case is whether HAP's transactions in Clarus securities were "incident to the establishment or maintenance by [HAP] of a primary or secondary market (otherwise than on a national securities exchange or an exchange exempted from registration under section 78e of this title) for such security." 15 U.S.C. § 78p(d). Clarus argues that HAP's packaged trades were not "otherwise than on a national securities exchange," because many of the individual legs of these trades were printed and executed using the processes and facilities of national exchanges. *See* Opposition at 10-17. HAP maintains, however, that its use of the downstream facilities of the exchange was "incident to" its maintenance of an OTC market in packaged trades for Clarus securities. *See* Motion at 11-21; Reply at 2-5. Thus, the main issue in determining whether Section 16(d)'s exception for OTC market makers applies is whether the utilization of a national securities exchange to print individual legs of packaged trades that HAP negotiated over-the-counter places HAP outside of that exemption. This issue is one of first impression.

**1.    The Text of Section 16(d)**

One component to the parties' dispute is whether Section 16(d)'s parenthetical "(otherwise than on a national securities exchange or an exchange exempted from registration under section 78e of this title)" refers to the location where the trading activity is conducted or where the market-making activity is conducted. The better reading of the statute is the latter, for a few reasons.

First, the phrase "otherwise than on a national securities exchange" comes immediately after the phrase "the establishment or maintenance by him of a primary or secondary market." 15 U.S.C. § 78p(d); *cf. Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 204 (2022) (explaining that "[t]he last-antecedent rule instructs that the correct antecedent is usually the nearest reasonable one" and therefore an interpretation linking a parenthetical to the phrase

36

immediately preceding it, while "hardly a slam dunk[,] . . . is one reason to prefer [that] reading—or at least to regard [another] as not clearly right").  If Congress had intended the parenthetical to apply to trading activity, it would have been more natural to place that language after "any purchase and sale, or sale and purchase."  Moreover, the parenthetical interrupts the phrase "primary or secondary market . . . for such security," providing further textual evidence that the *market* must be "otherwise than on a national securities exchange."

Thus, Clarus's repeated references to HAP's failure to establish that it was engaged in "OTC trading" are beside the point.  *See* Opposition at 11 (arguing that Section 16(d) exempts "market makers who are . . . trading over the counter"); *id.* at 11 n.10 ("The OTC market refers to securities that are not traded on an exchange."); *see generally id.* at 11-15.  HAP's liability turns not on whether HAP's trades in Clarus securities were placed over-the-counter, but whether the *market* that HAP "establish[ed] or maintain[ed]" for Clarus securities was "otherwise than on a national securities exchange."

### 2.  *C.R.A. Realty*'s Application

The preceding interpretation of the statutory text does not fully resolve the parties' dispute, however.  That is because much of Clarus's argument turns on the more fundamental issue of whether a market is truly "maintain[ed] . . . otherwise than on a national securities exchange" if the national exchange is implicated, in some form, in the firm's market-making activities.  Clarus's primary argument opposing HAP's invocation of Section 16(d) is that HAP is "incorrect in asserting that [HAP's] 'packaged trading' of Clarus securities was conducted 'over the counter' as a market maker and [HAP is] therefore exempt from Section 16(b)."  Opposition at 11.  Clarus states that "Section 16(b) exempts from liability market makers who are not using a national exchange but are trading over-the-counter."  *Id.*; *see id.* at 11 n.10 ("The OTC market refers to

securities that are not traded on an exchange.").[8]  Clarus contends that HAP's trading does not

meet this standard because "the individual 'legs' of [HAP's] packaged trades were listed,

submitted, executed, cleared, printed, confirmed, and settled on a national exchange and not on the

OTC market," and therefore reasons that "[a]s HAP's trading in Clarus securities was conducted

on national securities exchanges, it does not qualify for the Section 16(d) exemption, which applies

---

[8] Clarus's statement that "[t]he OTC market refers to securities that are not traded on an exchange," Opposition at 11 n.10, could be read as hinting at a more aggressive reading of Section 16(d) that would exclude from its coverage transactions in a company's securities if those securities are listed on any national exchange.  This position would not be without some support in the history of the Amendments Act.  That history suggests that the market-making exception was targeted at small companies which were not traded on national markets, which makes sense because insiders in these companies had not previously been exposed to Section 16(b) liability prior to the 1964 amendments to the securities laws. *See, e.g.*, Painter, *supra*, at 364-65 (explaining that the Special Study Group's recommendation was targeted at market makers "in small concerns which have just completed their first public offering"); Bender, *supra*, at 1420-21 (noting that the Amendments Act extended Section 16 "to large issuers whose securities are traded over the counter," and that the legislation "would have subjected many underwriting firms active in the over-the-counter market to insider-trading liability under section 16(b), because the distribution of new securities [was] accomplished primarily in that market").  *But see* Phillips & Shipman, *supra*, at 774 (concluding that while "[s]ome of the Commission's materials indicate that the section was intended to deal primarily with the sponsorship problem," "most of the legislative history indicates that the section itself does not have such a narrow scope, and that it applies to all primary or secondary marketmakers").

Moreover, such a reading may comport with the distinction between the "specialists," who functioned to make markets on exchanges, and the "market makers," who served a similar function in the OTC market for new or smaller companies.  *See* Painter, *supra*, at 372 n.49 (explaining the distinction between these two positions and providing colloquies from the debates on the Amendments Act concerning this distinction).  Contemporary academic literature also suggests that whether Section 16(d) applied to the so-called "third market"—the OTC market for listed securities—was at least somewhat of an open question.  *See* Phillips & Shipman, *supra*, at 773-74 (concluding that Section 16(d) "would seem to be available for transactions in the third market"); Bender, *supra*, at 1423-25 (indicating that this was an open question but concluding that "the market-making exemption will probably be interpreted as applicable to transactions incident to the establishment or maintenance off the exchange of a market for listed securities").  In the end, Clarus does not press this point.  And regardless, such an interpretation would run squarely in the face of *C.R.A. Realty*, which concerned securities that were "each listed and traded on a national securities exchange."  738 F.2d at 74.

only to trades '*other* [sic] than on a national securities exchange.'" *Id.* at 11-12 (quoting 15 U.S.C. § 78p(d)).

To the extent Clarus is arguing that any trades executed on national securities exchanges necessarily fall outside Section 16(d), that argument is difficult to square with *C.R.A. Realty*. HAP correctly observes that Clarus's interpretation would seem to "suggest that to qualify for the exemption, the 'trading' of Clarus securities . . . must have been OTC." Reply at 3; *see id.* (arguing that "the exemption does not cover OTC trading; it covers OTC market making"). As explained above, the text of the statute refers to the location of the market, rather than the location of where the trades in question were executed. Moreover, *C.R.A. Realty* expressly applied Section 16(d) to the securities of TSI, which themselves were "each listed and traded on a national securities exchange." 738 F.2d at 74. *C.R.A. Realty* therefore confirms the Court's conclusion that the best reading of the statute is to understand the parenthetical "otherwise than on a national securities exchange" to refer to the location in which the market-making activities are conducted, rather than where the trades themselves are executed.

Furthermore, the briefing in *C.R.A. Realty* makes clear that Drexel's trading in TSI common stock was entirely conducted through national securities exchanges. In its opening brief, CRA argued that "[i]t is undisputed that [Drexel] never made an over-the-counter market in TSI common stock, that security being at all relevant times, traded on the New York Stock Exchange." Appellant's Brief, *C.R.A. Realty Corp. v. Tri-South Invs.*, No. 83-7798 (2d Cir. 1983), at 17. And in its reply brief, CRA again pressed, "[h]ow can it be made clearer that one who claims to be making an over-the-counter market in bonds cannot claim an exemption for his trading activity in the common stock of the same issuer on the New York Stock Exchange?" Appellant's Reply Brief, *C.R.A. Realty Corp. v. Tri-South Invs.*, No. 83-7798 (2d Cir. 1983), at 3; *see also id.* at 4-5

(arguing that the district court improperly applied Section 16(d) "based on its finding of a relationship between common stock trading on the New York Stock Exchange . . . and sporadic trading of obscure bonds in a presumed market-making capacity").  Clarus's position that trades executed on a national securities exchange categorically fall beyond Section 16(d)'s protection would necessarily mean that Drexel's stock trading too should have fallen outside the exception. That the Second Circuit was presented with this argument and nonetheless affirmed the district court's grant of summary judgment in favor of Drexel supports the conclusion that HAP's individual trades—many of which were indisputably executed on the national securities exchanges—can still fall within Section 16(d), so long as these trades were "incident to" HAP's establishment or maintenance of an OTC market in packaged trades for Clarus securities.

Similarly, Clarus's appeal to the Exchange Act's definitions of the term "exchange" to include the "market *facilities maintained by such exchange*," and the term "facility" as including "tangible or *intangible property* whether on the premises or not" and "*any service* thereof for the purpose of *effecting or reporting* a transaction on an exchange," is unavailing.  Opposition at 13 (quoting 15 U.S.C. § 78c(a)(1)-(2)).  The import of Clarus's appeal to these definitions is to try to broaden the scope of "national securities exchange" for purposes of Section 16(d).  Clarus argues that HAP's use of the exchange's services to effect or report transactions means that its market-making business fell within the ambit of the exchange.  But under the statute and *C.R.A. Realty*, the question remains whether the relevant "market . . . for such security" existed "otherwise than on a national securities exchange," 15 U.S.C. § 78p(d)—*i.e.*, whether Drexel's market for convertible debentures in TSI stock existed over-the-counter.  This implicates two sub-issues: what the relevant "market . . . for such security" is and where that market is said to be "establish[ed] or maintain[ed]."

40

*C.R.A. Realty* answers the first question, as the relevant market there was the market in TSI debentures. But the decision was not clear on the second. Clarus tries to dismiss *C.R.A. Realty* as "inapposite," because the legs of HAP's packaged trades "were executed on national exchanges." Opposition at 13-14. But in *C.R.A. Realty*, the TSI debentures, in which Drexel was market making, were "listed and traded on a national securities exchange." 738 F.2d at 74. *C.R.A. Realty* does not explicitly state whether Drexel's market making in these debentures was conducted on national exchanges, however, so in the end, *C.R.A. Realty* cannot by itself refute Clarus's argument concerning the scope of Section 16(d). This recenters the focus of the Court's analysis: is HAP considered to have engaged in OTC market making for Clarus securities even if it utilized the facilities of the national securities exchanges to print many of the individual legs of packaged trades?

### 3. Utilizing the Facilities of a National Securities Exchange to Print Legs of Packaged Trades Does Not Disqualify HAP from Section 16(d)'s Exception

As noted above, the issue of whether the relevant "market . . . for such security" existed "otherwise than on a national securities exchange," 15 U.S.C. § 78p(d), implicates two sub-issues: what the relevant "market . . . for such security" is and where that market was "establish[ed] or maintain[ed]." *See supra* V.B.2.

The parties' dispute turns on the first of these issues, the market definition. The view of the relevant market HAP was making is dispositive because it is undisputed that the aggregated packaged trades (*i.e.*, the conversions and reverse conversions) were negotiated and agreed to over the counter, while the individual legs of those trades were printed on exchanges. If HAP's market is defined as the composite, packaged trades for Clarus stock and options, this case falls closer to the situations encountered in *Nomura Securities* and contemplated in the 1991 Release, as the individual execution of on-exchange trades in the legs is thus merely "incident to" and a function

of providing liquidity in the OTC packaged trade market in Clarus securities that HAP was making. Clarus, on the other hand, urges that the packaging of the trades holds no significance in defining the "market . . . for such securit[ies]." Instead, Clarus views the relevant market as the market for stock and options, since those packages are merely made up of individual trades of stock and options which were all executed on an exchange.

The undisputed evidence shows that HAP has the better market definition. HAP would be approached by brokers for counterparties, who would ask if HAP was interested in entering into a packaged trade. 56.1 Stmt. ¶ 38. HAP would respond to the counterparty's broker with an executable price for the packaged trade, which conveyed the particular price or parameters that HAP would agree to for that packaged trade. *Id.* ¶ 39. After the executable price was communicated, the parties would negotiate[9] the terms of the package, including prices, quantities, strike prices, and expiry dates for the individual legs. *Id.* ¶ 40. These discussions were conducted via phone and chat application communications. *Id.* ¶ 41. Once the terms were finalized, the broker took HAP's bid for a packaged trade and received final approval from the customer. *Id.* ¶¶ 42-43. Thus, the relevant market participants all understood that what was being negotiated was an aggregated trade composed of Clarus securities, set with a specific executable price, with the legs of the transaction contingent on their execution together.[10] *Id.* ¶ 97.

---

[9] Clarus argues that HAP was not engaged in market making because it negotiated prices with brokers. Opposition at 16-17. Clarus offers no authority in support of this proposition. As HAP points out, *see* Reply at 5 n.7, HAP's traders understood that once they had quoted a bid-and-ask price, they were obligated to fulfill an order made at that price within a reasonable amount of time. That HAP ultimately executed certain trades at slightly different (and presumably less favorable) prices than those that it initially quoted because its counterparty would not accede to the initial bid-and-ask does not mean it was not engaged in market making.

[10] Section 16(d) exempts a dealer's purchases and sales "of an equity security" when that dealer establishes or maintains an OTC "market . . . for such security." 15 U.S.C. § 78p(d). Thus, the market must be maintained for the equity security being purchased and sold. One might then

Importantly, many of these packaged trades consisted of legs that involved both stock and options, which are not traded on the same exchange. *Id.* ¶ 95. Although many legs were individually printed on national securities exchanges, the kinds of packaged trades that HAP conducted in Clarus securities could not be entered into on a single national exchange. *Id.* ¶ 96; *see also* Lundelius Dep. Tr. at 236:9-237:19 (testifying that while the legs of the transactions were executed on the exchanges, "[t]he packages [were] never executed on an exchange as a package"); *id.* at 238:9-16 ("The package . . . it's not something that anyone can go and transact in without pulling the pieces apart. The pieces are all separate and you can't transact the package as a package.").[11]

---

question whether HAP's market in packaged trades is a market for "such security," or instead a market for a different, bespoke product. *See C.R.A. Realty Corp.*, 738 F.2d at 77 (adopting a more flexible view of the meaning of "such security," interpreting the term to at least encompass Section 3(a)(11)'s concept of convertibility). For present purposes, though, the limits of the term "such security" are irrelevant. Certainly, a packaged trade of Clarus stock and options is not itself an "equity security," the trade of which would be subject to potential Section 16(b) liability. The relevant consideration, however, is not the meaning of "such security," but the meaning of a "*market . . . for* such security." The same Clarus security transacted as part of a packaged trade in the OTC market was also subsequently printed as a leg on either a regional or national exchange. That underlying security therefore was involved in two separate "*market[s] . . . for* such security." 15 U.S.C. § 78p(d). The former market for these securities—the packaged trade market—offered certain benefits desirable to market participants that were not available if the participant entered traditional options or stock markets. *See* Evans Dep. Tr. at 146:13-19 ("[E]ach of these instruments are available to trade on the exchange, but these prices and particularly these prices for these volumes for a simultaneous execution of them all contingent upon each other, is not available on the exchange. It's only available in the OTC market."). Thus, a packaged trade is not a distinct security being offered, but is only a way to define a market for Clarus stock and options. By analogy, a can of soda may be sold to a retail customer or to a wholesaler. These are two distinct "market[s] . . . for" the soda, each of which comes with a different price and customer for the same underlying product.

[11] As noted at *supra* V.B.2, Clarus points the Court to the Exchange Act's definitions of the term "exchange" to include the "market *facilities maintained by such exchange*," and the term "facility" as including "tangible or *intangible property* whether on the premises or not" and "*any service* thereof for the purpose of *effecting or reporting* a transaction on an exchange." Opposition at 13 (quoting 15 U.S.C. § 78c(a)(1)-(2)). It is clear from these definitions that the transactions in the individual legs of each package occurred on an exchange, even when those legs were only

Accordingly, HAP was making a market in packaged trades for Clarus stock and options by offering packaged trades in those securities, with brokers reaching out to ask if HAP was interested in entering into specific packages. *See* Padia Decl. ¶¶ 29-71 (outlining examples of executed trades, including the relevant chat logs); Conn Decl., Exhs. 3, 4, 5 (records of chat conversations between HAP and brokers regarding packaged trades). Since the national securities exchanges did not maintain such a market—indeed, each packaged trade had to be broken down and cleared through its individual legs—HAP made a market in packaged trades for Clarus securities "otherwise than on a national securities exchange."

With the market defined as one in packaged trades for Clarus securities, *C.R.A. Realty*, *Nomura Securities*, and the 1991 Release support HAP's argument that Section 16(d) protects the execution of individual legs on national exchanges as "incident to" HAP's OTC market-making in packaged trades. *C.R.A. Realty* teaches that transactions on a national securities exchange may still receive Section 16(d) protection if they are made in the ordinary course of the dealer's business in providing liquidity in its OTC market. *C.R.A. Realty Corp.*, 738 F.2d at 77-78. The SEC's no-action letter in *Nomura Securities* likewise illustrates that Section 16(d) may protect transactions on national securities exchanges—even in the same underlying shares of stock subject to separate transactions in the OTC market—so long as the "transactions . . . to be executed on the [market maker's] behalf on the [national exchange]" were "in connection with the [market maker's]

---

printed on the exchange. But that does not speak to where HAP's market in *packaged trades* was said to be "establish[ed] or maintain[ed]." As Mr. Lundelius's deposition testimony makes clear, packaged trades undisputably could not be transacted on an exchange and had to be broken into their individual legs. Thus, the market in packaged trades was not located "on a national securities exchange," 15 U.S.C. § 78p(d), but instead was "establish[ed] or maintain[ed]" over-the-counter through HAP's chats and phone calls with brokers.

ordinary course of business in meeting its customers' demands . . . in the over-the-counter market."
1990 WL 287048, at *1.

So while Clarus appeals to the "essential functions" performed by the role of the exchanges in HAP's market-making activities, Opposition at 12-13, the same could be said for the role of the NYSE in Nomura's maintenance of an OTC market in Tokyo.  That a national securities exchange serves to effectuate the dealer's liquidity in the market it has made does not mean that the market itself exists on that exchange.  The 1991 Release elaborates that this interpretation extends to domestic "transactions, *even those made on a national securities exchange*, that are incident to the establishment or maintenance of a *domestic or foreign over-the-counter market*, provided that the transactions are in the ordinary course of the dealer's business in providing liquidity in the over-the-counter market."  1991 Release at 7259 (emphases added).  The Court agrees with the SEC's approach in *Nomura Securities* and the 1991 Release, which simply take *C.R.A. Realty* to its logical endpoint.  *See C.R.A. Realty Corp.*, 738 F.2d at 77-78.  The trades in the individual legs here were not only "incident to," but necessary for, the operation of HAP's OTC market in packaged trades for Clarus securities.  Thus, interpreting Section 16(d) to cover the individual legs "is consistent with both the realities of the marketplace and the congressional goal of facilitating market-making activity."  *Id.* at 77.

The SEC's response in *Morgan Stanley* provides the strongest authority for Clarus's interpretation of Section 16(d).  Many of HAP's arguments would seem equally applicable to Morgan Stanley's activities in block transactions on the NYSE: Morgan Stanley was solicited by other market participants to conduct those transactions, normal exchange transactions could not accommodate these large-scale positions at a single price, and so Morgan Stanley viewed its trades on the national exchange to be incident its market making in block transactions outside of the

national exchanges. 1992 WL 316358, at *3-4. HAP's understanding of Section 16(d) would seem to support Morgan Stanley's view that these transactions "should be exempt pursuant to Section 16(d) because they are incident to the maintenance of an over-the-counter market in which Morgan Stanley acts as a 'market maker' in block transactions." *Id.* at *6. After considerable back-and-forth, the SEC ultimately disagreed. *Id.* at *9.

As noted at *supra* IV.B, *Morgan Stanley* is not binding on the Court "beyond whatever persuasive value [it] might have." *Gryl ex rel. Shire Pharms. Grp.*, 298 F.3d at 145. Understanding *Morgan Stanley* is complicated by the SEC staff's lack of explanation, a factor which undercuts the decision's "persuasive value" to the Court. *Id.* (finding "wholly unpersuasive" an SEC no-action letter which "provide[d] neither authority nor rationale"). As Morgan Stanley's correspondence with the SEC pointed out, the staff's most likely rationales found tension with both the legislative history of the statute and the Commission's extension of *Nomura Securities* through the 1991 Release. 1992 WL 316358 at *7-8. But even setting aside these issues, two additional points about *Morgan Stanley* bear mentioning.

First, as just explained, HAP's market in packaged trades for Clarus securities was not available on any given exchange, as the exchanges listed stock and options separately. Therefore, unlike in *Morgan Stanley*, where counterparties could enter the marketplace for the funds' shares, the brokers HAP dealt with had no other obvious counterparty for the interrelated trades they wanted to execute. HAP's packaged trades also provided a separate benefit to the market by linking together the exchanges for stock and options. In this sense, HAP's activities are closer to those blessed by the SEC in *Nomura Securities*, where Nomura had insufficient sources in Japan to purchase Jakarta shares to meet its customer demands in the OTC market. Absent HAP, this additional liquidity in the marketplace would dry up since there is no independent market for

packaged transactions.  Interpreting Section 16(d) to cover HAP's activities would thus serve the purposes of the statute, as the Second Circuit identified in *C.R.A. Realty*, of encouraging "more dealers that are willing to make markets," so as to provide greater depth, liquidity, and competition in markets for an issuer's securities.  738 F.2d at 77.

Second, even the SEC staff in *Morgan Stanley* appeared to recognize that the question of whether Morgan Stanley's proposed activities fell within Section 16(d) was a difficult one.  It took nearly a year, multiple letters, and several rounds of discussions between the staff and Morgan Stanley's counsel before the staff came to its conclusion.  *See* 1992 WL 316358, at *1-9. Ultimately, whether HAP's activities fall within Section 16(d)'s exception is a close question with no clear answer in the statute's text, history, or any source of legal authority.  "Lacking a clearer expression by Congress of an intention to impose strict § 16(b) liability for [HAP's activities], [this Court] decline[s] to accept [Clarus's] construction of § 16(d)."  *C.R.A. Realty Corp.*, 738 F.2d at 77; *accord Foremost-McKesson*, 423 U.S. at 252.

That is not to say that HAP's protections are unlimited.  Under *C.R.A. Realty*, HAP's trades must be "directly related to [its] market-making activity" to enjoy Section 16(d)'s protection.  738 F.2d at 78.  This would, as just explained, cover the trades of the individual legs executed on the national exchanges to fulfill the packages.  But whether HAP's other trades in Clarus securities also fall under Section 16(d) is a separate issue.

**C.    HAP's Non-Packaged Trades in Clarus Securities Qualify for Section 16(d) Protection as "Incident to" HAP's OTC Market-Making Activities in Packaged Trades**

As explained at *supra* I.B.2, HAP's trading activity in Clarus securities was not limited to executing packaged trades and the legs of those trades.  HAP also traded in the underlying securities, purportedly for the purpose of delta hedging HAP's portfolio risk from its packaged

trading business.  *See* Padia Decl. ¶ 21 (explaining that HAP engaged in certain hedging trades in

Clarus common stock and options with the purpose of "ensur[ing] that HAP's overall portfolio

remained delta neutral" and that these hedging trades were "incidental to" HAP's OTC market

making); Oral Arg. Tr. at 5:8-6:4.  Mr. Lundelius, whose testimony the Court credits for purposes

of this analysis, disagreed with the contention that HAP was engaged in delta hedging.  Instead,

Mr. Lundelius concluded that "HAP's trading strategies for [Clarus] securities appear to be partial

hedging, which allows HAP to bet on [Clarus] stock movements with some downside protection."

Lundelius Rebuttal Report ¶ 32.  Mr. Lundelius further explained during his deposition that these

underlying transactions were made with the aim of mitigating risk.  *See* Lundelius Dep. Tr. at

161:16-162:10 (testifying that "the puts and calls were an attempt to partially hedge some of the

risk but they obviously didn't hedge all of the risk" and that he was "not trying to make any

determination as to what HAP's intent was other than to make a profit").

   This disagreement raises the portent of a genuine dispute of fact regarding how to best

characterize HAP's non-packaged trades in Clarus securities.[12]  But any dispute is not *material*

and therefore does not preclude the entry of summary judgment.  *See Anderson*, 477 U.S. at 248

("As to materiality, the substantive law will identify which facts are material.  Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment.").  The parties' experts may disagree on whether HAP's activities are

better characterized as delta hedging as opposed to hedging for general risk reduction.  Clarus's

---

[12] Clarus does not clearly oppose summary judgment on the ground that a genuine dispute of material fact exists stemming from this disagreement between the parties' experts.  But the Court will still consider the merits of this issue, as the Second Circuit has explained that "the district court may not grant the motion [for summary judgment] without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial."  *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001) (Sotomayor, J.).

opposition brief argues that under its position, the non-packaged trades "were not market making or arbitrage but were 'for the purpose of hedging,'" and contends that "[h]edging is a strategy to reduce risk and is different from arbitrage." Opposition at 15 n.13. Even accepting Clarus's position as true, it only leads the Court to conclude that HAP's non-packaged trades in Clarus securities were hedging for the purpose of risk mitigation. As will be explained next, even if a jury resolved this dispute in Clarus's favor, it would not "affect the outcome of the suit under the governing law," *Anderson*, 477 U.S. at 248, and therefore the disagreement between the parties' experts does not preclude the entry of summary judgment.

Understood as hedging transactions, these separate trades in the underlying securities fall within the scope of Section 16(d). In *C.R.A. Realty*, the Second Circuit explained that Section 16(d) should be interpreted with the recognition that "[m]arket makers in convertible securities frequently hedge their positions in the convertible by trading in the underlying common stock to avoid some of the risk inherent in market making." 738 F.2d at 77. Accordingly, HAP's hedging transactions can qualify for the Section 16(d) exception, so long as these trades were intended to mitigate risk in HAP's OTC market-making business. *See id.* ("An interpretation of § 16(d) that would exempt these common stock trades would encourage dealers to make markets in the convertible securities by permitting them to limit the risk inherent in holding a position in the convertible securities."). But to avoid the risk of inappropriately shoehorning into Section 16(d) coverage of potential insider trading activity, *C.R.A. Realty* made clear that such hedging trades must still qualify as "incident to" the market-making activity in question. *Id.* at 78. The Second Circuit instructed that "only common stock trades *directly related* to the market-making activity in the convertible securities would be found exempt from § 16(b)" as "incident to" OTC market-making activities. *Id.*

Thus, the Court's inquiry shifts to whether these hedging trades were "directly related" to HAP's OTC market-making activities in packages trades. On this, the parties offer little briefing. Clarus argues in a footnote that certain trades could not be "incident to" market-making activities because Mr. Lundelius "noted that HAP engaged in 370 packaged trades of Clarus securities during the relevant period out of 33,216 total trades," and therefore HAP's contention that "99% of HAP's trading was 'incidental' to its 1% market making trading . . . is the tail wagging the dog." Opposition at 15 n.13. HAP's expert, however, "calculated that about 86% of HAP's trades were part of packaged trades," reflecting HAP's view that "every entry in HAP's trade files" should not be treated as a separate trade, "whether that entry reflects a transaction to purchase one share or 500,000 shares." Reply at 3-4 n.3. While both parties' experts worked off the same data, they employed different calculation methods to determine what percentage of HAP's trading in Clarus securities was packaged trading versus non-packaged trading. Clarus's expert calculated his percentage based on the number of total trades, whereas HAP's expert calculated his percentage based on the number of underlying shares traded. *See* Lundelius Rebuttal Report ¶ 13; Overdahl Report ¶ 62; Conn Decl., Exhs. 57, 58 (HAP trade files).

This disagreement can best be framed as the experts offering differing calculation methods to assess direct relation. Clarus measures direct relation by calculating trade frequency through the percentage of total trades, whereas HAP frames direct relation as a measure of trade volume, as calculated by the number of underlying shares. Ultimately, HAP employs the more persuasive method to assess direct relation under *C.R.A. Realty*, for two reasons.

First, the goal of the direct-relation test is to avoid extending Section 16(d) to trades not truly "incident to" market-making activity. *C.R.A. Realty Corp.*, 738 F.2d at 78. Trade frequency, standing alone, takes an overly simplistic view of trading data by accounting for every trade the

same, when in reality different trades could be for tremendously different volumes of shares.  *See* Reply at 3 n.3 ("Plaintiff is misleadingly treating every entry in HAP's trade files as a separate trade, whether that entry reflects a transaction to purchase one share or 500,000 shares.").

Second, *C.R.A. Realty*'s "directly related to" language appears to originate from the SEC's *amicus curiae* brief in that case.  *See* Brief of Securities and Exchange Commission, *C.R.A. Realty Corp. v. Tri-South Invs.*, No. 83-7798 (2d Cir. 1983), at 10 ("Thus, only common stock traded directly related to the market-making activity in the convertible securities would fall within Section 16(d).").  The SEC's *amicus curiae* brief, when elaborating on the concept of direct relation, examined trade volume to measure disproportionality.  *See id.* at 11 ("However, stock trades which are not directly related to the market-making activity are outside the scope of the exception.  For example, high volume trading in the common stock would not be incidental to a disproportionately low volume of trading in the convertible security.").  This provides some indication that the Second Circuit understood its direct-relation test to be a measure of trade volume.  For these reasons, HAP's measure of direct relation is preferable and, accordingly, the volume of HAP's hedging trading in Clarus securities was not disproportionate to the volume of its packaged trading, so as to trigger a concern that HAP's hedging trades were not incidental to its market-making activities.[13]

Aside from this objection, Clarus makes no serious effort to argue that HAP's hedging trades were not "directly related" to its OTC market making.  Clarus states that these trades were

---

[13] To be sure, adopting HAP's calculation method does not entail resolving a dispute of material fact.  The parties' disagreement goes to how to properly frame *C.R.A. Realty*'s direct-relation interpretation of Section 16(d)'s "incident to" language, which presents a question of law. *See Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) ("None of the facts is disputed, and nothing remains for a jury to resolve.  The dispute, instead, is about the legal significance of those facts.").

not "incident to" OTC market making because the "legs [of the packaged trades] were executed on national exchanges." Opposition at 13-14. But this simply refers to the parties' legal dispute about how to characterize the status of the packaged trades. *See supra* V.B.3. Clarus also argues that HAP cannot claim both to have engaged in arbitrage and also to have simultaneously been engaged in market making. *See* Opposition at 21-23. But Clarus does not argue that HAP cannot qualify for the Section 16(d) market-making exception on this basis, nor is there an obvious import to this argument. In short, once the parties' main dispute about how to understand the packaged trades is resolved, Clarus offers no persuasive reason to avoid applying *C.R.A. Realty*'s instruction regarding risk-mitigating trades to HAP's other trading activities. Summary judgment as to HAP's trading activities in Clarus securities in their entirety is therefore appropriate.

## VI. Conclusion

For the foregoing reasons, the Court holds that Section 16(d) insulates HAP from Clarus's claim under Section 16(b). The Court therefore grants HAP's motion for summary judgment and dismisses Clarus's claim with prejudice. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants HAP Trading, LLC, and Harsh A. Padia, and to close this case.

SO ORDERED.

Dated: March 14, 2025
     New York, New York

                                       JOHN P. CRONAN
                            United States District Judge